HOME LAND & CATTLE CO. et al. v. McNAMARA et al.

(Circuit Court of Appeals, Ninth Circuit. October 14, 1901.)

No. 683.

1. CONTRACTS—STIPULATED DAMAGES FOR BREACH—PENALTY.

Defendant contracted to sell to complainants its herd of cattle on the range in Montana, estimated at 30,000 head, at a uniform price per head. The herd consisted of beef and stock cattle, and there was a provision that not less than 9,000 should be beef cattle, and that for any number short of that defendant should pay to complainants $20 per head. *Held,* that the stipulation for such payment could not be considered as in the nature of a rebate in price on account of the difference in value of the two classes of cattle, since the contract contained no provision for the relative number of each class to be delivered, nor as fixing any actual or equitable measure of damages, but that it was a stipulation for a penalty which a court of equity would not enforce.

2. SAME—MONTANA STATUTE.

Under Code Mont. §§ 2242, 2243, which provide that a contract by which the amount of damages to be paid for the breach of an obligation is determined shall be void except that "the parties to a contract may agree upon an amount which shall be presumed to be the amount of damages sustained by a breach thereof when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage," a stipulation in a contract for the sale of cattle that the seller shall pay to the purchaser a certain sum per head for any shortage in the number of a certain class contracted to be delivered is void, the actual damages in such case being capable of ready ascertainment.

3. SPECIFIC PERFORMANCE—BREACH OF CONTRACT BY COMPLAINANT.

Defendant contracted to sell complainants its herd of cattle, estimated at 30,000 head, 9,000 of which were to be beef cattle, and stipulated to pay $20 per head for any shortage of beef cattle below that number.

The cattle were on the range, and were to be delivered at different times and places during the season, as should be designated. A few days before the expiration of the time for the completion of the delivery, defendant was making a delivery under the contract, and, after delivering a part of the number on hand, demanded payment therefor before delivering the remainder. This complainants refused, except on allowance of the stipulated $20 per head for the shortage of beef cattle, and defendant thereupon refused to deliver more. At that time it had delivered in all about 16,000 head, of which about 7,200 head were beef cattle, and had but a few hundred head remaining, none of which were beef cattle. *Held* that, the stipulation for the payment of the $20 per head being in the nature of a penalty, and unenforceable, as well as void under the statute, complainants were not justified in refusing the payment demanded, and their doing so constituted a breach of the contract, which precluded them from maintaining a suit in equity to compel specific performance by the delivery of the remainder of the cattle.

4. REFERENCE—REVIEW OF MASTER'S REPORT—CONCLUSIONS OF LAW.

Where a cause has by consent been referred to a master to make findings on all the issues, both of fact and law, a party may file exceptions to the master's conclusions of law after the report has been filed in court, under equity rule 83, notwithstanding his failure to file any exceptions before the master.

Appeal from the Circuit Court of the United States for the District of Montana.

This was a suit in equity, brought by the appellees, citizens of Montana, to enforce the specific performance of a contract which they had made with one of the appellants, the Home Land & Cattle Company, a corporation, of the state of Missouri, which will be called herein the "Cattle Company." The contract was made at Chicago on May 27, 1897. It provided for the sale and delivery of a herd of cattle belonging to the Cattle Company, which, by the terms of the contract were said to consist of 30,000 head, more or less, of stock cattle and beef cattle, ranging in Valley, Dawson, and Custer counties, Mont. The contract provided that the cattle should be gathered by the Cattle Company and delivered to the appellees at certain designated stock yards in Montana during the regular round-up season of 1897, no cattle to be tendered or accepted later than November 1, 1897. All stock cattle were to be accepted by the appellees whenever tendered prior to November 1, 1897, in not less than train load lots. All beef cattle were to be delivered and counted when marketable for beef in the opinion of the appellees. The contract price to be paid was $25 per head for every head delivered, payable upon the delivery. There was a special guaranty in the ninth clause of the contract that not less than 9,000 head of the cattle delivered during the season should be beef cattle of certain designated grades, and that in case of the failure of the Cattle Company to deliver that number of beef cattle it would pay to the appellees "the sum of $20 in cash for each and every head less than 9,000 head of such cattle so delivered." There was a further provision that the appellees upon their part agreed to purchase of the Cattle Company 500 head of saddle and work horses, to be selected out of its band of horses, at $20 per head, at the end of the round-up season of 1897; but there was no covenant upon the part of the company to sell the said horses. The interest of the Cattle Company in the contract was assigned to the National Bank of Commerce of St. Louis, and that corporation was made a party defendant to the bill. The bill alleged the execution of the contract and the performance thereof on the part of the appellees, and but a partial performance on the part of the appellants. Upon issue joined, by consent of the parties, the cause was referred to the master in chancery to hear the testimony and report the same, together with his conclusions of fact and law, to the court. His findings, which were adopted by the court in rendering a final decree, embodied substantially the following facts: That during the round-up season of 1897 there were delivered and accepted by the appellees from the Cattle Company in all about 16,000 head of cattle, comprising

both stock and beef cattle, and, in addition thereto, the appellees received from the board of stock commissioners of the state of Montana the proceeds of the sales of 148 stray cattle belonging to the Home Land & Cattle Company. That of the cattle so delivered, 7,135 were beef cattle, such as were stipulated for in the guaranty of the ninth clause of the contract, and 1,865 of the 9,000 head of beef cattle so contracted for were not delivered. That upon October 18, 1897, the Cattle Company notified the appellees that it would deliver to them on October 21, 820 head of beef cattle, 631 head of stock cattle, and 500 head of horses; and upon October 21 and 22, 1897, the Cattle Company did deliver to the appellees 820 head of beef cattle and 113 head of stock cattle, the price of which, under the contract, was $23,325. That the Cattle Company was then prepared to make further delivery to the appellees of the 457 stock cattle and 500 head of horses, but refused to deliver the same, or to make any further delivery, unless the appellees would pay the $23,325 due upon the delivery just made. The appellees refused to pay said sum, but offered to pay for said 457 head of cattle and said horses upon their delivery, provided that the appellants, or either of them, would pay the appellees the amount due for shortage in the number of beef cattle called for under the guaranty of the contract at the specified price of $20 per head, and the appellees thereupon presented to the appellants a statement and tendered payment of $9,675, which they claimed would be the balance due the appellants for all the cattle delivered and cattle and horses to be delivered after deducting $37,900 for the shortage upon the beef cattle. This offer the appellants refused to accept, and refused to deliver the 457 head of stock cattle or the horses. That on October 22, 1897, the Cattle Company had finished its round-up for that season, and had made no preparations for, and did not intend to make, further delivery under said contract, and did not have on its range to exceed 300 head of beef cattle, and the appellants then knew that the Cattle Company could not deliver the remainder of the 9,000 head of beef cattle. It was further found that there was an increase in the value of cattle during the season of 1897 of $5 per head. It was found by the court that the appellees depended upon the delivery of the cattle mentioned in the contract to furnish cattle under contracts which they had to the government Indian reservations, and that they had prepared for and made provision to winter at their ranches in Montana cattle to fill such contracts, and depended upon the cattle contracted for to fill the same. The court thereupon decreed the specific performance of the contract, so far as it related to the 457 head of stock cattle, and ordered that the same be turned over to the appellees without further payment to the appellants. 105 Fed. 202.

W. E. Cullen, E. C. Day, and W. E. Cullen, Jr., for appellants.
H. G. McIntire and S. H. McIntire, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

One of the contentions upon the part of the appellants is that the appellees cannot demand the specific performance of the contract, for the reason that they themselves failed to carry out its provisions by refusing to pay the $23,325, which, under the contract, became due upon the delivery of the cattle which were turned over to and received by the appellees upon October 21st and 22d. The contracting parties, at the time of entering into the contract, had estimated the herd of cattle at 30,000 head. It was known that it consisted of two grades,—beef cattle and stock cattle. It was believed that of the former there were 9,000 head, and the Cattle Company so guarantied. The price of $25 per head for the whole herd was

agreed upon on that basis. The beef cattle were more valuable than the stock cattle. The testimony on behalf of the appellees is that, but for the guaranty that there were 9,000 head of the beef cattle, they would have paid no more than $23 per head for the herd. It must be borne in mind that this provision for the forfeiture of $20 per head for shortage in the stipulated number of beef cattle does not provide for general damages for breach of the contract. It does not relate to the stock cattle, nor does it contemplate damages for failure to deliver the full 30,000 head. If, for instance, there had been a delivery of 9,000 head of beef cattle under the contract, and no other cattle whatever had been delivered, the provision in the contract for forfeiture would not have applied to such a breach. There is no ground for the contention that the provision requiring the Cattle Company to pay the appellees $20 per head for all the beef cattle that fell short of the 9,000 head so guarantied is equivalent to a rebate from the purchase price upon the theory that the stock cattle were less valuable than the beef cattle. The facts fully contradict this theory. It is proven that at the stipulated price of $25 per head the appellees, although they received less than the stipulated number of cattle, received better cattle than their contract called for. The number of cattle actually found to be in the herd, instead of 30,000, was about 16,000 head, but the proportion of beef cattle to the stock cattle in the herd as delivered was much greater than the proportion contemplated in the contract. By the terms of the contract considerably less than one-third of the herd were to be beef cattle. As the cattle were actually delivered, nearly one-half were beef cattle. It is apparent, therefore, that there was no damage to the appellees by reason of the disparity in value between the stock cattle and the beef cattle which they had received; on the contrary, that disparity was to their advantage. The bill alleges, it is true, that the cattle under the contract possessed "a special and peculiar value" to the appellees, "which could not be adequately compensated for in money damages." This averment is evidently inserted for the purpose of showing that the case is one for specific performance. It does not relate to the beef cattle especially, but to the whole number of cattle contracted for. There is no averment in the bill that the beef cattle possessed special value to the appellees, and there is no allegation upon which it may be predicated that the appellees sustained special damages for the failure to deliver the beef cattle, or any damages other than those which resulted from the increase in value of the cattle. Not only is there no such averment, but there is no evidence whatever of such damage. It appears from the testimony that more than one-half of the beef cattle which were received by the appellees under the contract were, immediately upon delivery to them, at different times, consigned to the market at Chicago; and one of the appellees testified that no more than 1,000 head of them were used in filling their contracts with the Indian agencies, and that the appellees were not damaged, so far as their beef contracts were concerned, by the failure of the appellants to deliver the remainder of the 9,000 head. The provision for the payment of $20 per head for each head short of

the 9,000 did not provide, therefore, for actual damages, or for an equitable compensation to the appellees in case of a breach of the guaranty, in any view of a possible deficiency in the guarantied number of the beef cattle. It can readily be seen, for instance, that, if one-half of the 16,000 head delivered had been beef cattle, there would have been a shortage of 1,000 beef cattle under the contract, involving a forfeiture of $20,000 for a breach which would have occasioned no damage whatever to the appellees; or, if the 16,000 head delivered had been all stock cattle, and there had been a total failure to furnish any beef cattle whatever, the forfeiture would have been $180,000, a sum vastly in excess of any possible damages. In short, it is evident, under the facts of the case, that the appellees could sustain no injury from the breach of the guaranty, except that which resulted from the increase in the value of the beef cattle during the season of 1897,—a contingency that was not foreseen, the amount of which increase could not be pre-estimated, and which the referee has found was in fact $5 per head, a sum grossly disproportionate to the stipulated forfeiture. The agreement can be regarded in no other light, therefore, than as a stipulation for a penalty. It calls for the payment of a sum of money greatly in excess of the actual damages, and it is a case where the damages could have been easily ascertained by proof of the market value of the cattle at the time of the breach of the contract. Such agreements the courts uniformly refuse to sustain, leaving the party injured by the breach to his remedy at law for the recovery of his actual damages. 1 Suth. Dam. 490.

But whether the agreement in this instance is strictly one for a penalty or for liquidated damages is not material. In either case it is made void by the Code of Montana (sections 2243, 2244), which enacts that a contract by which the amount of damages to be paid or other compensation to be made for breach of obligation is determined is to that extent void, except that "the parties to a contract may agree upon an amount which shall be presumed to be the amount of damages sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage." There is nothing in the record to show that the damage to the appellees by reason of the breach of the guaranty in this case could not have been ascertained without difficulty. The only element of damages from the shortage in the number of the beef cattle was the difference between the contract price and the market price at the time of delivery. The appellees had no legal excuse, therefore, for refusing to pay the $23,325 which was due under the contract upon the delivery of cattle on October 22d. They had no right to withhold the money, or to apply it on their claim for damages. Their damages, if any they sustained under the contract, had not been liquidated. By refusing to make the payment, they violated a material provision of their agreement. Their refusal to pay justified the appellants in declining to make further delivery of cattle, and it effectually bars them now from suing in equity for the specific performance of the contract.

It is said, however, that the appellants failed to avail themselves

of the right to question the ruling of the court below by their omission to take proper exception to the findings of the master in chancery. The case of Kimberly v. Arms, 129 U. S. 512, 524. 9 Sup. Ct. 355, 32 L. Ed. 764, is cited in support of the doctrine that, where parties have consented to a reference to a master to hear and decide all the issues of the case, and report his findings, both of fact and of law, "his determinations are not subject to be set aside or disregarded at the mere discretion of the court." It is true that the court in that case remarked that such findings, "like those of an independent tribunal, are to be taken as presumptively correct, subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence or in the application of the law, but not otherwise." It is not necessary, however, in the case at bar, to determine what would have been the effect of a failure to take exception to the findings of the master upon a question of fact, or his omission to make material findings of fact. It is sufficient to point to the fact that the exception to the construction given by the court to the ninth clause of the contract was taken in apt time within the rule indicated in Kimberly v. Arms. After the report of the master was filed, the appellants filed in the circuit court proper and specific exception to the master's conclusions of law upon the very ground which is involved in the foregoing discussion, and upon the contention that the only damages which the appellees could be allowed were to be computed upon the difference between the market value of the cattle at the time of the delivery and the price which was agreed to be paid. Eq. Rule 83; Hatch v. Railroad Co. (C. C.) 9 Fed. 856; Jennings v. Dolan (C. C.) 29 Fed. 861; Fidelity Insurance & Safety Deposit Co. v. Shenandoah Iron Co. (C. C.) 42 Fed. 372.

The decree will be reversed, and the cause remanded, with instruction to dismiss the bill.